**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| and | § | |
| THE STATE OF TEXAS, | § | |
| *ex rel.* | § | |
| KAREN REYNOLDS, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 9:09-CV-124 |
| | § | |
| PLANNED PARENTHOOD GULF COAST | § | |
| F/K/A PLANNED PARENTHOOD OF | § | |
| HOUSTON & SOUTHEAST TEXAS, | § | |
| INC., | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S MOTION TO DISMISS RELATOR'S THIRD AMENDED**
**COMPLAINT AND BRIEF IN SUPPORT**

# TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT ............................................................................. 1

ISSUES PRESENTED ................................................................................................. 3

ARGUMENT ............................................................................................................... 3

A.   STANDARD OF REVIEW ................................................................................. 3

     1.   RELATOR'S THIRD AMENDED COMPLAINT MUST CONTAIN SUFFICIENT FACTS TO STATE A CLAIM THAT IS PLAUSIBLE ON ITS FACE, *AND* THAT SETS FORTH THE PARTICULARS OF THE ALLEGED FRAUD. ................................................................ 3

     2.   THE COURT SHOULD ONLY CONSIDER *FACTUAL* ALLEGATIONS IN RELATOR'S THIRD AMENDED COMPLAINT – NOT CONCLUSIONS MASQUERADING AS FACTS. .............................................. 4

B.   RELATOR'S CLAIMS UNDER § 32.039 OF THE TEXAS HUMAN RESOURCES CODE (COUNTS IV–VI) ARE NOT PRIVATE CAUSES OF ACTION. ................................. 5

C.   A VIOLATION OF TITLE XX IS NOT ACTIONABLE UNDER THE TMFPA (COUNTS IV–V). ................................................................................................. 6

D.   RELATOR'S TMFPA CLAIMS (COUNTS IV–VI) GO OUTSIDE THE MAY 4, 2007 BAR DATE. ..................................................................................................... 7

E.   THE THIRD AMENDED COMPLAINT DOES NOT PROVIDE A FACTUAL BASIS FOR CLAIMS ARISING OUTSIDE THE LUFKIN CLINIC (COUNTS I–VI). ......................... 7

F.   AN ALLEGED "POLICY" TO MAXIMIZE REVENUES WILL NOT SUPPORT AN FCA OR TMFPA CLAIM. ................................................................................................. 9

G.   RELATOR'S ALLEGATIONS OF "ACROSS-THE-BOARD" TESTING DO NOT SUPPORT AN FCA OR TMFPA CLAIM. ...................................................................... 10

     1.   THE ALLEGATIONS FAIL TO MEET THE RULE 9(B) STANDARD. .................... 10

     2.   THE ALLEGATIONS ALSO FAIL TO MEET THE RULE 8(A) STANDARD. .......... 12

H.   RELATOR'S UNNECESSARY CONDOMS/VAGINAL FILM ALLEGATIONS DO NOT SUPPORT AN FCA OR TMFPA CLAIM. .............................................................. 15

     1.   THE ALLEGATIONS FAIL TO MEET THE RULE 8(A) STANDARD. .................... 15

     2.   THE ALLEGATIONS FAIL TO MEET THE RULE 9(B) STANDARD. .................... 16

I.   RELATOR'S UNNECESSARY BIRTH CONTROL COUNSELING ALLEGATIONS DO NOT

SUPPORT AN FCA OR TMFPA CLAIM. .............................................................................. 16

J.      RELATOR'S UNQUALIFIED SERVICES ALLEGATIONS DO NOT SUPPORT AN FCA OR
        TMFPA CLAIM................................................................................................................. 17

K.      RELATOR'S COMPARISON OF PROGRAM-FUNDED VS. SELF-PAY PATIENTS DO NOT
        SUPPORT AN FCA OR TMFPA CLAIM. ............................................................................ 18

L.      RELATOR'S "SUPER BILL" ALLEGATIONS DO NOT SUPPORT AN FCA OR TMFPA
        CLAIM............................................................................................................................. 19

CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) ............................................................................. *passim*

*Bell Atlantic v. Twombly,*
550 U.S. 544 (2007) .........................................................................4, 14, 16, 19

*Menominee Indian Tribe of Wisc. v. Thompson,*
161 F.3d 449 (7th Cir. 1998) ...............................................................13

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez,*
403 F.3d 324 (5th Cir. 2005) ...............................................................6

*R2 Invs. LDC v. Phillips,*
401 F.3d 638 (5th Cir. 2005) ...............................................................13

*Sealed Appellant I v. Sealed Appellee I,*
156 F. App'x 630 (5th Cir. 2005) .........................................................8

*United States ex rel. Bennett v. Boston Sci. Corp.,*
2011 WL 1231577 ............................................................................. *passim*

*United States ex rel. Carter v. Medica-Rents Co.,*
285 F. Supp. 2d 742 (N.D. Tex. 2003) .................................................9

*United States ex rel. Colucci v. Beth Israel Med. Ctr.,*
785 F. Supp. 2d 303 (S.D.N.Y. 2011) ..................................................9

*United States ex rel. Doe v. Dow Chem. Co.,*
343 F.3d 325 (5th Cir. 2003) ...............................................................4

*United States ex rel. Fitzgerald v. Novation, LLC,*
No. 3:03-cv-1589-N (N.D. Tex. Sept. 17, 2008) ..................................7

*United States ex rel. Foster v. Bristol-Meyers Squibb Co.,*
587 F. Supp. 2d 805 (E.D. Tex. 2008) ...........................................9–11

*United States ex rel. Grubbs v. Kanneganti,*
565 F.3d 180 (5th Cir. 2009) ..........................................................4, 11

*United States ex rel. Harris v. Alan Ritchey, Inc.,*
2006 WL 3761339 (W.D. Wash. Dec. 20, 2006) ..................................8

*United States ex rel. Jamison v. McKesson Corp.,*
649 F.3d 322 (5th Cir. 2011) ...............................................................7

*United States ex rel. Lam v. Tenet Healthcare,*
    481 F. Supp. 2d 673 (W.D. Tex. 2006)..................................................................11

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
    125 F.3d 899 (5th Cir. 1997) ................................................................................11

*United States ex rel. Wall v. Vista Hospice Care, Inc.,*
    778 F. Supp. 2d 709 (N.D. Tex. 2011) .........................................................7, 8, 13

*United States ex rel. Zemplenyi v. Group Health Coop.,*
    No. C09-0603 RSM, 2010 WL 3584444 (W.D. Wash. Sept. 10, 2010) ..................9

*United States v. McNinch,*
    356 U.S. 595 (1958).................................................................................................9

*Williams v. WMX Techs., Inc.,* 112 F.3d 175, 179 (5th Cir. 1997) ..............................11

### TEXAS CASES

*Brown v. De La Cruz,*
    156 S.W.3d 560 (Tex. 2004).....................................................................................5

*Shaw v. State,*
    243 S.W.3d 647 (Tex. Crim. App. 2007)................................................................12

### FEDERAL STATUTES

31 U.S.C. § 3729(a) ....................................................................................................2, 17

42 U.S.C. §§ 1396-1396v .............................................................................................2, 6

42 U.S.C. §§ 1397-1397f ..............................................................................................2, 6

### TEXAS STATUTES

TEX. HUM. RES. CODE § 32.039 ....................................................................................5–6

TEX. HUM. RES. CODE § 32.0248 ......................................................................................2

TEX. HUM. RES. CODE § 36.002 ....................................................................................2, 6

TEX. HUM. RES. CODE § 36.104 ........................................................................................7

### RULES

FED. R. CIV. P. 8(a) ........................................................................................4, 12, 15, 18

FED. R. CIV. P. 9(b) ............................................................................................... *passim*

iv

FED. R. EVID. 201(b) ...................................................................................................................13

## REGULATIONS

45 C.F.R. §§ 96.70–.74 .................................................................................................................2

25 TEX. ADMIN. CODE § 56.1 .....................................................................................................13

Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Defendant Planned Parenthood Gulf Coast f/k/a Planned Parenthood of Houston & Southeast Texas, Inc. ("PPGC" or "Defendant"), files this Motion to Dismiss Relator's Third Amended Complaint (the "Third Amended Complaint") and Brief in Support.

## SUMMARY OF THE ARGUMENT

This motion to dismiss responds to Relator Karen Reynolds's ("Relator") fourth attempt to plead a case against PPGC.  After Relator amended her Original Complaint on her own in June 2011, PPGC moved to dismiss the First Amended Complaint on several grounds, including that the Government encourages and requires many of the billing practices that Relator claims are fraudulent, that Relator had no right of action under some of the statutes that she pled, that her claims were partially barred by limitations, and that she failed to plead them with particularity – especially on her attempt to implicate eleven clinics in which she never stepped foot.  Relator did not respond to the arguments raised in PPGC's Motion to Dismiss.  Instead, she amended her complaint again, dropping defendant Planned Parenthood Action Fund of Southeast Texas and spelling out more of the facts that lead Relator to believe that some kind of fraud has occurred.

But Relator's Second Amended Complaint was still legally deficient and not particularized enough to pass muster under Fifth Circuit precedent.  PPGC thus moved to dismiss Relator's Second Amended Complaint as well.  Again, however, rather than responding to PPGC's Motion to Dismiss, Relator has amended her complaint for yet a third time.  This time, Relator dropped defendant PP Surgical and the conspiracy and alter ego claims that went with it, narrowed the time frame of the conduct at issue to address PPGC's limitations arguments, and dropped her claim of fraud related to PPGC's reimbursement for emergency contraception services, which Medicaid covers instead of prohibits as Relator's Second Amended Complaint

alleged.  But Relator's Third Amended Complaint fails to address the other legal bases for dismissal raised in PPGC's Motion to Dismiss the Second Amended Complaint.  In other words, PPGC's arguments are still viable and, at this point, merit a ruling from the Court.  That ruling should be to dismiss Relator's Third Amended Complaint.

Relator alleges that PPGC submitted false claims to the Government for Medicaid, Title XX, and Women's Health Program ("WHP") reimbursement.[1]  Each of these programs[2] funds a wide variety of family planning services, including, *inter alia*, STD screening, contraception and contraception counseling, safe-sex education, and social services referrals.  Relator alleges that, through a scheme to maximize revenues received under Medicaid, Title XX, and WHP, PPGC overcharged those programs for medically-unnecessary services, services not actually provided to patients, and services not covered by Medicaid.

In Counts I, II, and III, Relator alleges causes of action for fraud under the federal False Claims Act ("FCA"), and, in Counts IV, V, and VI, under section 32.039 of the Texas Human Resources Code and the Texas Medicaid Fraud Prevention Act ("TMFPA").[3]  In Relator's allegations related to these counts, she uses strong adjectives and hyperbole to make it sound as

---

[1] Although the merits of Relator's allegations are not at issue at this stage of the proceedings, PPGC denies any wrongdoing.

[2] Medicaid provides family planning services for medically needy individuals who typically fall below 133% of the federal poverty level.  *See* 42 U.S.C. §§ 1396–1396v.  WHP is a program created by the Texas Health and Human Services Commission through a federally-approved waiver that expands Medicaid coverage for the program to uninsured women who fall below 185% of the federal poverty level and who are not otherwise eligible for Medicaid. *See* TEX. HUM. RES. CODE § 32.0248.  Title XX is a block grant that pays for family planning services on behalf of individuals who fall below 185% of the federal poverty line, regardless of whether they are enrolled in Medicaid. *See* 42 U.S.C. §§ 1397–1397f; 45 C.F.R. §§ 96.70–.74; and http://www.hhsc.state.tx.us/reports/2011/Block-Grant-0811.pdf.  WHP and Title XX serve the same goals, but services provided under WHP are, pursuant to the waiver, considered to be Medicaid expenditures.  Title XX, on the other hand, provides one-time assistance.

[3] The FCA imposes liability on "[a]ny person who: (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(1)–(2).  The TMFPA contains a parallel provision, but Texas's Act applies only to knowing or intentional false statements of material fact to obtain Medicaid (not Title XX) payments.  TEX. HUM. RES. CODE § 36.002(1).

though PPGC violated the law.  However, the substance of Relator's specific allegations: (a) fails to state a plausible claim for relief because, without more specifics, the conduct alleged actually *complies* with applicable regulations and government guidance; (b) fails to describe the claim with sufficient particularity under Rule 9(b); and/or (c) fails as a matter of law.  Because Relator's claims are legally deficient, the Court should grant Defendant's Motion in its entirety.

## ISSUES PRESENTED

1.      Should Relator's claims under Section 32.039 of the Texas Human Resources Code be dismissed because she lacks a private right of action to bring such claims?

2.      Should Relator's TMFPA claims be dismissed to the extent they are based on claims submitted under Title XX, given that the TMFPA only covers claims submitted under Medicaid?

3.      Do Relator's TMFPA claims go beyond the limitations period that applies when, as here, the government declines to intervene?

4.      Do any of the alleged schemes described in the Third Amended Complaint state a claim for relief under the FCA or TMFPA that is plausible on its face?

5.      Should Relator's FCA and TMFPA fraud claims be dismissed for failure to plead with particularity?

## ARGUMENT

**A.      Standard of Review**

1.      <u>Relator's Third Amended Complaint must contain sufficient facts to state a claim that is plausible on its face, *and* that sets forth the particulars of the alleged fraud.</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A claim has facial plausibility when the plaintiff pleads sufficient *facts* – as opposed to legal conclusions, which the court need not accept as true – to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id*. at 1949–50.  Although the plausibility standard is not akin to a "probability requirement," it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Id*. at 1949.

> Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."

*Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 557 (2007)).   If a claim is not plausible on its face, then it fails to meet even the most basic pleading requirements of Federal Rule of Civil Procedure 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a).

A claim filed under the FCA, however, also must meet the heightened pleading requirements of Rule 9(b).   "The particularity demanded by Rule 9(b) is *supplemental* to the Supreme Court's recent interpretation of Rule 8(a) requiring enough facts taken as true to state a claim to relief that is plausible on its face."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (emphasis added); *see also United States ex rel. Bennett v. Boston Sci. Corp.*, 2011 WL 1231577, at **9, 29 (S.D. Tex. Mar. 31, 2011) (analyzing motion to dismiss FCA complaint under both Rule 8(a) and Rule 9(b), and holding that relator's allegations were "both insufficient and insufficiently particularized").  Failure to comply with Rule 9(b) results in dismissal.  *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 328 (5th Cir. 2003).

2.      The Court should only consider *factual* allegations in Relator's Third Amended Complaint – not conclusions masquerading as facts.

A court considering a motion to dismiss should begin its analysis by "identifying the allegations in the complaint that are not entitled to the assumption of truth."  *Iqbal*, 129 S. Ct. at 1951.   Such allegations include formulaic recitals of the elements of a cause of action, legal conclusions couched as factual allegations, and conclusory statements.  *Id*. (refusing to consider, for Rule 8 plausibility purposes, allegations that defendants "willfully and maliciously agreed to subject [plaintiff]" to harsh conditions of confinement "as a matter of policy . . . ," and that they were the "principal architects" of and "instrumental" to the adoption and execution of a policy to

confine people based solely on their Arab/Islamic origin).  The Court should then examine the remaining factual allegations to determine if they plausibly suggest an entitlement to relief, and, in the case of an FCA complaint, whether they state a plausible claim with particularity.  *Id.*; *Bennett*, 2011 WL 1231577, at *29.

**B.**   **Relator's Claims Under § 32.039 of the Texas Human Resources Code (Counts IV–VI) Are Not Private Causes of Action.**

The Court should dismiss Relator's claims under Section 32.039 of the Texas Human Resources Code (Counts IV–VI) because that Section does not create a private right of action. By its terms, Section 32.039 sets forth only an administrative remedy for the Texas Health and Human Services Commission ("the Commission") to enforce through civil penalties.  *See* Tex. Hum. Res. Code § 32.039(b)–(c).   The statute repeatedly refers to enforcement by the Commission and for its benefit.  *See, e.g.*, *id.* § 32.039(c)(2) (specifying that a person who violates the section is "liable to the [Commission] for ... payment of an administrative penalty"); *id.* § 32.039(i) (stating that "the [Commission] shall assess the penalty"); *id.* § 32.039(t) ("All funds collected under this section shall be deposited in the State Treasury to the credit of the General Revenue Fund.").   Because the statute makes clear that the fines imposed by the Commission are administrative penalties, Relator would have to demonstrate legislative intent to *imply* a private cause of action in order to proceed with her claim.  *Brown v. De La Cruz*, 156 S.W.3d 560, 564 (Tex. 2004) (holding that a statute which imposed a penalty precluded enforcement by a private litigant unless he could bring "himself so clearly within the statute's terms as to justify implying a private cause of action").

Relator cannot do so.  The Legislature did not provide an express private right of action to enforce Section 32.039 of the Human Resources Code, nor did it indicate an intent to create an

implied one.  Thus, the Court should dismiss Relator's claims in Counts IV–VI of the Third

Amended Complaint under Section 32.039 of the Texas Human Resources Code.

**C.      A Violation of Title XX Is Not Actionable Under the TMFPA (Counts IV–V).**

Although her allegations are not clear regarding Title XX, Relator seems to allege in

Counts IV and V that PPGC defrauded Title XX as a basis for relief under the Texas Medicaid

Fraud Prevention Act ("TMFPA").   TMFPA liability, however, is restricted to false claims

submitted to *Medicaid*.   TEX. HUM. RES. CODE § 36.002(2) (defining an unlawful act under the

statute when "the person knowingly conceals or fails to disclose information that permits a

person to receive a benefit or payment *under the Medicaid program* that is not authorized or that

is greater than the benefit or payment that is authorized") (emphasis added).

Title XX is distinct from Medicaid, which Congress passed in 1965 as Title XIX of the

Social Security Act.  *See* Grants to States for Medical Assistance Programs (Medicaid Act), Pub.

L. No. 89-97, 79 Stat. 343 (1965) (codified as amended at 42 U.S.C. §§ 1396–1396v (2006)).

Congress passed Title XX of the Social Security Act in 1981 to provide block grants to the states

for social services, including family planning.  *See* Omnibus Budget Reconciliation Act, Pub. L.

No. 97-35, 95 Stat. 357, 511–19 (1981) (codified as amended at 42 U.S.C. §§ 1397 to 1397f

(2006)); *see also Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 327 (5th

Cir. 2005) (distinguishing Medicaid from block grants provided to the states under Title XX).

To the extent that Relator's TMFPA claims in Counts IV–V allege a violation of Title XX, those

claims should be dismissed.[4]

---

[4] Assuming that Relator has a private right of action to bring her claim under § 32.039 of the Human Resources
Code (she does not, as explained in Section B, *supra*), that claim is fatally flawed for the same reason.  That statute
specifies that the State may impose penalties for misrepresentations in applications for payments "under Title XIX
of the federal Social Security Act," *i.e.* Medicaid.  TEX. HUM. RES. CODE § 32.039(a)(1).  It does not apply to Title
XX.

**D.      Relator's TMFPA Claims (Counts IV–VI) Go Outside the May 4, 2007 Bar Date.**

Further, Relator's TMFPA claims (Counts IV–VI) should be dismissed in part because the State of Texas has notified the Court that it is declining to intervene.[5]  *See* Doc. No. 22.  Prior to May 4, 2007, the TMFPA provided: "If the state declines to take over the action, the court *shall* dismiss the action." TEX. HUM. RES. CODE § 36.104(b) (emphasis added).  Although the Legislature amended this section in 2007 to permit private actions to proceed despite the State of Texas's decision not to intervene, the amendment applies "only to conduct that occurs on or after" May 4, 2007.  Acts 2007, 80th Leg. R.S., ch. 29, § 6(a), eff. May 4, 2007.

Relator generally alleges false claims in violation of the TMFPA that were submitted between July 30, 2005 and February 2009.  These claims, however, cannot go back further than May 4, 2007.  *See United States ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 724  (N.D. Tex. 2011) (Lynn, J.) (dismissing an allegation brought under the TMFPA because the State of Texas did not intervene and the alleged conduct occurred before May 4, 2007); *United States ex rel. Fitzgerald v. Novation, LLC*, No. 3:03-cv-1589-N (N.D. Tex. Sept. 17, 2008) (Godbey, J.) (same).  The Court should dismiss Relator's TMFPA claims in Counts IV–VI to the extent that they seek recovery on claims for reimbursement filed before May 4, 2007.

**E.      The Third Amended Complaint Does Not Provide a Factual Basis for Claims Arising Outside the Lufkin Clinic (Counts I–VI).**

Although Relator does not allege that she worked outside the Lufkin clinic, she claims that fraudulent billing occurred at multiple health centers.  Third Am. Cmplt. ¶ 25 (alleging that training and policies from corporate personnel ensured "that all health clinics were constantly

---

[5] The State has notified the Court "that it is declining to intervene in this action" and has reserved the right to intervene at a later date.  Doc. No. 22 at 1.  However, Texas law provides only two choices to the State, either to intervene or "decline[] to take over the action." TEX. HUM. RES. CODE § 36.104(a)(1)–(2).  It is worth noting that the Fifth Circuit recently stated that when the Government declines to intervene, the case "presumably lacks merit." *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 331 (5th Cir. 2011).

maximizing the financial payments received from said government programs"). Relator provides no factual basis for this conclusion. She does not allege that she ever worked or consulted with any employee at any other clinic who implemented the alleged policies. Nor does she describe any examples of anyone falsifying medical records or providing medically unnecessary services at any other clinic. She alleges that all billing policies and procedures were issued "'company-wide' to all clinics," but she bases this allegation on her impressions of meetings with corporate personnel at the *Lufkin* clinic. *Id.* ¶ 22.

In keeping with Fifth Circuit precedent, to the extent that Relator alleges that PPGC clinics outside Lufkin submitted false claims to the Government, these allegations are not pled with particularity and should be dismissed. *See Wall*, 778 F. Supp. 2d at 723 ("The specific facts [Relator] has alleged relate solely to her work in Denton, Texas, and cannot support by inference her general pleading, 'upon information and belief,' that similar frauds were also perpetrated in Indiana, Massachusetts, Nevada, and New Mexico, in alleged violation of those states' laws against false claims."); *see also, e.g.*, *Sealed Appellant I v. Sealed Appellee I*, 156 F. App'x 630, 633 (5th Cir. 2005) (holding that allegations of fraud outside the dates of relator's employment based on audit extrapolations and good faith belief are simply not sufficient under Rule 9(b)); *United States ex rel. Harris v. Alan Ritchey, Inc.*, 2006 WL 3761339, at *6 (W.D. Wash. Dec. 20, 2006) (dismissing allegations under Rule 9(b) relating to defendant's locations other than the Auburn, Washington facility because particular "allegations related to one location do not meet the pleading requirements of Rule 9(b) for other locations"). The Court should dismiss the alleged violations in Counts I–VI to the extent they include locations other than the Lufkin clinic.

**F.     An Alleged "Policy" to Maximize Revenues Will Not Support an FCA or TMFPA Claim.**

Nearly all of Relator's claims depend on PPGC's alleged "policy" to "ensure that all health clinics were constantly maximizing the financial payments received from said government programs." Third Am. Cmplt. ¶ 25; *see also id*. ¶¶ 20–24, 28–29, 33–34.  It is well-established, however, that alleging that a defendant sought to maximize revenues from government sources is insufficient to state a claim under the FCA or TMFPA.  *See, e.g.*, *United States ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 314 (S.D.N.Y. 2011) ("The worst that can be said of BIMC is that it took advantage of the uncertainty in the regulations to maximize its Medicare billings. This is not fraud.")[6]

The Supreme Court has cautioned that the FCA does not punish every type of fraud committed on the Government.  *Bennett*, 2011 WL 1231577, at *12 (quoting *United States v. McNinch,* 356 U.S. 595, 599 (1958)).  "The [FCA] attaches liability, not to the underlying fraudulent activity, but to the claim for payment."  *Id*. (internal citations omitted).  "It is important to remember that the focus in an FCA suit must be on the *false claim* itself."  *United States ex rel. Foster v. Bristol-Meyers Squibb Co.*, 587 F. Supp. 2d 805, 813 (E.D. Tex. 2008) (Heartfield, J.) (emphasis original).  "Evidence of an actual false claim is the *sine qua non* of a False Claims Act violation."  *Id*.

---

[6] *See also United States ex rel. Carter v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 774 (N.D. Tex. 2003) ("While there is evidence that Medica–Rents aggressively sought to maximize its profits by obtaining the greatest amount it could from Medicare when billing for the ROHO Mattress Overlay, that is to be expected from a for-profit and its behavior does not demonstrate that Medica–Rents knew it could not bill under code E0277."); *United States ex rel. Zemplenyi v. Group Health Coop.*, No. C09-0603 RSM, 2010 WL 3584444, at *2 (W.D. Wash. Sept. 10, 2010) ("Relator's allegations that defendants are involved in a scheme that promotes the performance of unnecessary surgeries in order to increase revenue concerns itself with the existence of an alleged underlying scheme, without providing specific facts about the claims themselves. Absent at least some specific details regarding the alleged false claims, plaintiff is unable to meet the particularity requirements set forth by Rule 9(b) necessary to survive dismissal.").

Here, Relator's revenue-maximization allegations do not amount to fraud committed on the Government, much less a violation of the FCA or TMFPA or any law at all.  There is no prohibition against a provider seeking the maximum payment to which the provider is entitled under the law.  Perhaps knowing this, Relator's Third Amended Complaint attempts to paint a picture whereby this allegedly inimical policy serves as the backdrop to allegations of false claims that must be pled with particularity.  As set forth in detail below, however, Relator's specific allegations of medically-unnecessary or unprovided services fail to meet the Rule 8 and Rule 9 pleading standards.  Relator's description of PPGC's alleged reimbursement maximization "policy" should not be used as a way for Relator to "nudge her claims across the line from conceivable to plausible."  *Iqbal*, 129 S. Ct. at 1949; *see also Foster*, 587 F. Supp. 2d at 824–25 (holding that relator's allegations jumped to unsubstantiated conclusions, and although the pleading might have suggested fraud was possible, "the complaint contained no factual or statistical evidence to strengthen the inference of fraud beyond possibility.")

**G.      Relator's Allegations of "Across-the-Board" Testing Do Not Support an FCA or TMFPA Claim.**

As explained above, Relator's revenue-maximization theory is not enough to plead fraud under the FCA or TMFPA.  Even taking the allegations about that alleged scheme into account, however, Relator does not provide the missing particulars of the various types of alleged fraud described in the Third Amended Complaint.

    1.      The allegations fail to meet the Rule 9(b) standard.

Paragraph 26 of the Third Amended Complaint purports to describe violations by PPGC of the FCA and TMFPA in the provision of services to Medicaid, WHP, and Title XX patients "on an 'across the board' basis even when such services were not medically necessary."  Third Am. Cmplt. ¶ 26.   Specifically, Relator alleges that PPGC tested patients for Gonorrhea,

Chlamydia, HIV, and Syphilis, and performed urinalyses, hemoglobin counts, and pregnancy testing.  *Id*.  This claim falls short of Rule 9(b).

"At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud."  *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)).  Although Rule 9(b) does not require a relator to allege the specific details of each and every alleged fraud over a multi-year period, Relator must "plead the fraudulent scheme with particularity and provide ***representative examples of specific fraudulent acts conducted pursuant to that scheme*.**"  *Bennett*, 2011 WL 1231577, at *17 (emphasis added) (citing *Foster*, 587 F. Supp. 2d at 821); *see also United States ex rel. Lam v. Tenet Healthcare*, 481 F. Supp. 2d 673, 688 (W.D. Tex. 2006) (dismissing FCA complaint that failed to specifically identify one fraudulent transaction and failed to specifically allege the fraud's "when," by alleging only that the fraudulent events occurred at some point in the 1980s, between 1995 and 2002, and in 1999).[7]  Relator also must do more than speculate that the services allegedly provided by PPGC without medical necessity were actually submitted to the government for payment.  *Grubbs*, 565 F.3d at 189–90 (holding that when the relator fails to allege the details of an actually submitted false claim, the complaint must at a minimum allege "reliable indicia that lead to a strong inference that claims were actually submitted").

Paragraph 26 of the Complaint does not state ***when*** the listed tests allegedly were provided on an across the board basis, other than "during her [10-year] employment."  It does not say ***who*** ordered the tests nor describe any patient who received them.  It does not describe ***why***

---

[7] Representative examples and specific instances are required even when the relevant information is in the possession of the Government.  *Foster*, 587 F. Supp. 2d at 821–22 (explaining that Rule 9(b) pleading standard will not be relaxed unless the information related to the claims is *peculiarly* within the possession of the defendant, and dismissing relator's claims for failure to provide representative examples or statistics in support of his allegations).

the tests were medically unnecessary for a particular patient.[8] And, perhaps most importantly, it does not provide *reliable indicia* that lead to a *strong* inference that claims were actually submitted by PPGC to the Government for the unnecessary tests. *See* Third Am. Cmplt. ¶ 26 (alleging only that Medicaid and Title XX patients were "provided" these tests on an across the board basis). And although Relator claims that she heard discussions of across-the-board testing occurring at other clinics, she provides no representative examples of such testing or factual details of those discussions (e.g., who, what, when, and where) to meet Rule 9(b)'s particularity requirement.

In short, Paragraph 26 makes the broad allegation that PPGC (the corporation, not any particular individual) provided Medicaid and Title XX patients with a set of tests regardless of medical necessity, but it does not describe or explain a single specific instance of such conduct. Relator's "across the board testing" allegations fail to satisfy Rule 9(b).

       2.      The allegations also fail to meet the Rule 8(a) standard.

Particularity is important to Relator's ability to state a claim based on allegedly medically-unnecessary "across the board" testing because, without the specifics, Relator's claim also fails to satisfy Rule 8(a). It fails to state a claim that is plausible on its face because Medicaid, Title XX, and WHP *require* that providers give certain patient populations the very tests listed in Paragraph 26 of Relator's Third Amended Complaint. *On its face, then, the Third Amended Complaint is just as likely to state that PPGC complied with the law, as it is to state a claim for violating it.*

---

[8] Nor does the Third Amended Complaint anywhere explain how Relator has concluded that various tests were medically unnecessary. Relator was a "Health Center Assistant" at PPGC. *See* Third Am. Cmplt. ¶ 12. A Health Center Assistant, also known as a medical assistant, is not a licensed position under the Texas Occupations Code. *Shaw v. State*, 243 S.W.3d 647, 661 (Tex. Crim. App. 2007) (A medical assistant is "a position which may include certification but is not licensed by the State of Texas as a 'healing art'"). As an unlicensed medical assistant, the determination of medical necessity is outside the scope of Relator's expertise.

The Medicaid, Title XX, and WHP family planning programs are governed by a complicated mix of federal and state statutes, regulations, waivers, manuals, and bulletins promulgated by the United States Department of Health and Human Services ("DHHS"), the Texas Department of State Health Services ("DSHS"), and the Commission.[9]   Providers of family planning services under these programs are "required to observe all guidelines and operating procedures outlined in the most recent Family Planning Policy Manual, as required by their contracts."  25 TEX. ADMIN. CODE § 56.1.[10]

The Family Planning Manual explains *and is consistent with* the conduct of PPGC described in Paragraph 26 of Relator's Third Amended Complaint.  The Manual requires:

- Annual Chlamydia testing for *all* sexually active females age 25 or younger, "even if symptoms are not present."  Ex. 1 at II-16.[11]

- Gonorrhea screening for *all* sexually active women who have "new or multiple sexual partners" and "inconsistent condom use."  *Id.*

- "***All patients tested for Gonorrhea should be tested for other STDs, including chlamydia, syphilis, and HIV***."  CDC STD Treatment Guidelines 2006, attached as Exhibit 2, at 43, and available at: http://www.cdc.gov/std/treatment/2006/urethritis-and-cervicitis.htm.

---

[9] Defendant requests that the Court take judicial notice of the manuals, bulletins, and memoranda promulgated by these government agencies under Rule 201(b) of the Federal Rules of Evidence.  Publications from government agencies are proper subjects for judicial notice.  *See R2 Invs. LDC v. Phillips*, 401 F.3d 638, 639 n.2 (5th Cir. 2005) (taking judicial notice of government agency documents in deciding Rule 12(b)(6) motion); *Menominee Indian Tribe of Wisc. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) (taking judicial notice of historical documents, documents in public record, and reports of administrative agencies); *Wall*, 778 F. Supp. 2d at 721 n.63 (taking judicial notice of the CMS Medicare Program Integrity Manual).

[10] The Family Planning Manual is distributed by DSHS.  It states expressly that it governs Title XX, Medicaid, and WHP providers:

The Department of State Health Services (DSHS) *Family Planning Policy and Procedure Manual for Title V, Title X, and Title XX* is a guide for contractors who deliver family planning services using Title V, Title X, and/or Title XX funds in Texas.  Providers of family planning services who are also reimbursed by Title XIX (Medicaid or WHP), must follow policies and procedures as established by the Texas Medicaid Program in the Texas Medicaid Provider Procedures Manual.

*See* FY08 Family Planning Policy Manual ("Family Planning Manual"), attached as Exhibit 1, at ii.

[11] Chlamydia testing is also recommended for women greater than 25 years old, if risk factors are present (i.e., a new sex partner or multiple sex partners), and women three to four months after treatment of a previous Chlamydia infection, especially in adolescents.  Ex.1 at II-16.

–   **"HIV** Testing: Contractors are required to offer HIV testing on-site. **HIV screening is recommended at least one time for clients in health-care settings** after the patient is notified that testing will be performed unless the client declines (opt-out screening). Subsequent tests are on the basis of clinical judgment and client risk."  FY09 Family Planning Policy Manual, attached as Exhibit 3, at II-18 (emphasis added). *See also* 2006 CDC recommendation at http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5514a1.htm.

–   "[A]ppropriate laboratory and diagnostic tests or interventions as indicated **by contractor policy or procedure** or clinician judgment" for all initial and routine follow-up family planning clients. Ex. 1 at II-16 (emphasis added).

The Family Planning Manual also instructs that certain tests/procedures "must be provided to clients, if required in the provision of the selected contraceptive method, and should be provided for the determination of health status and/or diagnostic purposes if indicated," including pregnancy test and other labs like blood glucose and serum cholesterol as indicated by history or physical.  *Id.* at II-16 and II-17.[12]

    *Twombly* and *Iqbal* require more than just allegations like those in Relator's Paragraph 26 regarding alleged "across the board" testing.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere **possibility** of misconduct, the complaint has alleged—but it has not **shown**—that the pleader is entitled to relief."  *Iqbal*, 129 S. Ct. at 1950 (citing FED. R. CIV. P. 8(a)) (emphasis added).

---

[12] Similarly, Appendix A to the Family Planning Manual incorporates Program Guidelines for Project Grants for Family Planning Services ("Guidelines") issued by the United States Department of Health and Human Services, Office of Population Affairs (OPA) in January 2001.  The Guidelines set forth the laboratory procedures listed in Paragraph 19 of the Third Amended Complaint and instructs that the following tests "must" be provided to *Title X* recipients "in the provision of a contraceptive method, and may be provided for the maintenance of health status and/or diagnostic purposes, either on-site or by referral":

    Anemia assessment [This can include hemoglobin blood count.]
    Gonorrhea and chlamydia test
    Vaginal wetmount
    Diabetes testing
    Cholesterol and lipids
    Hepatitis B testing
    Syphilis serology (VDRL, RPR)
    Rubella titer
    Urinalysis
    HIV testing

*See* Appendix A to FY2010 Family Planning Policy Manual, attached as Exhibit 4.

**H.     Relator's Unnecessary Condoms/Vaginal Film Allegations Do Not Support an FCA or TMFPA Claim.**

1.      <u>The allegations fail to meet the Rule 8(a) standard.</u>

Similarly, the handing out of condoms and vaginal film described in Paragraph 29 of the Third Amended Complaint does not, without more, state a plausible claim for relief on its face. Relator limits this particular claim to patients who were on a single method of birth control such as oral contraception or IUDs.  Third Am. Cmplt. ¶ 29.  Because patients are not protected against STDs when using methods like oral contraception and IUDs, which are only indicated for pregnancy prevention, it is just as easy to attribute the distribution of condoms and vaginal film to these patients to medical necessity as it is to fraud.

Indeed, family planning agencies are *encouraged* by the government to advise clients regarding the importance of using condoms.  The 2008 Family Planning Manual required all clients to receive "accurate and thorough client-centered counseling about STDs and HIV" to include "risk reduction and infection prevention information, to address sexual abstinence, mutual monogamy with an uninfected partner, ***and/or condom use***, as appropriate for the client (the ABC approach - <u>A</u>bstinence, <u>B</u>e faithful, <u>C</u>ondoms)."  Ex. 1 at II-18 (emphasis added).  In addition, the Program Guidelines for Project Grants for Family Planning Services instructs that "[c]onsistent and correct use of condoms should be encouraged for all persons at risk for STDs/HIV."  Ex. 4 at penultimate page.

The fact that Relator *believes* that extra protection was unnecessary does not mean that PPGC's conduct falls outside the government's guidelines.   Without more specifics distinguishing PPGC's alleged conduct from the activities condoned by the government's Family Planning Manual and Guidelines, Paragraph 29 at best alleges "facts that are 'merely *consistent* with' a defendant's liability," and that thus "stop short of the line between possibility and

plausibility of 'entitlement to relief.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557) (emphasis added).

        2.      <u>The allegations fail to meet the Rule 9(b) standard.</u>

The same particularity problem exists for Paragraph 29 of the Third Amended Complaint, which describes the provision of condoms and vaginal film to patients "despite the fact that the items were not needed or requested by the patient."  Third Am. Cmplt. ¶ 29.  Paragraph 29 does not identify ***who*** at the clinic allegedly instructed Relator to provide the condoms and film to patients.  It does not identify any particular patient who received them or explain ***why*** they were not needed.  Relator's claims also fail to identify the name, content, date, or whereabouts of the "policies" from which this alleged activity originated.  For the reasons described above in Section G.1, the allegations in Paragraph 29 of the Third Amended Complaint fail to provide sufficient particularity to support an FCA or TMFPA claim.

## I.    Relator's Unnecessary Birth Control Counseling Allegations Do Not Support an FCA or TMFPA Claim.

Relator next alleges that "PPGC required its employees to bill for birth control method counseling and multiple backup method counseling for every visit by a Medicaid or WHP-eligible patient," whether or not the counseling services were medically indicated or actually provided.  *Id.* ¶¶ 27–28.  The Third Amended Complaint, however, fails to provide any specifics or representative examples of such alleged conduct.

It does not name a single individual ***who*** billed for counseling services despite not having provided them.[13]  It does not state ***when*** the alleged scheme to bill for counseling services that were never provided took place.  It does not say ***where*** the alleged fraudulent counseling took place (i.e., at the Lufkin clinic or elsewhere).  It does not provide ***reliable indicia*** that lead to a

---

[13] Relator does not even name herself as a perpetrator of this alleged fraud.

*strong* inference that claims were actually submitted to the Government for unnecessary counseling services. For all of the reasons described above in Section G.1, the claims in Paragraphs 27–28 of the Third Amended Complaint fails for lack of particularity.

**J.     Relator's Unqualified Services Allegations Do Not Support an FCA or TMFPA Claim.**

In Paragraph 30, Relator alleges that "PPGC trained its employees to create fraudulent and misleading patient chart entries so as to obtain reimbursement" for abortion-related services that Medicaid and WHP do not cover. *Id.* ¶ 30. The only two examples described in support of this claim quote from memoranda allegedly sent to "clinic employees" in January and February 2009. *Id.* ¶¶ 30–31. The quoted portions of these memoranda (which are not attached in full to the Third Amended Complaint), however, do not demonstrate the *plausibility* of wrongdoing. Instead, they instruct employees that post-abortion visits are, indeed, "self-pay." *Id.* They also instruct employees to "note in the chief complaints that the client had a surgical or medical abortion 'x' weeks ago." *E.g.*, *id.* ¶ 30. This is *not* language that is consistent with hiding the nature of a patient's post-abortion visit. To the contrary, it demonstrates instructions to PPGC employees *to put in the chart itself* notes about a patient's recent abortion. Further, the fact that a patient had undergone an abortion did not render the patient ineligible to receive covered family planning services such as a well woman examination and birth control services.

Even assuming that these quotes describe something problematic, they do not state a claim under the FCA (or the TMFPA). As explained above, the FCA does not punish all fraud but only false claims intentionally submitted to the Government or records that are intentionally falsified and material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A)–(B). Other than a conclusory statement that claims for allegedly unqualified services were ultimately billed to the government, Relator does not anywhere in Paragraphs 30 and 31 provide representative

examples of how the charts that she alleges hid abortion services relate to either the submission of actual false claims to the Government or how they were material to a false or fraudulent claim. Further, Paragraphs 30 and 31 state a conclusion that these charts were "fraudulent and misleading," but Relator does not explain how or cite a single fact relating to intent.  Violation of the FCA and TMFPA requires scienter, and the Third Amended Complaint fails to recite ***facts*** to support plausible liability here.

**K.** **Relator's Comparison of Program-Funded vs. Self-Pay Patients Do Not Support an FCA or TMFPA Claim.**

Relator next alleges, in Paragraphs 32 and 33 of the Third Amended Complaint, that PPGC's alleged scheme to charge Medicaid patients for every test that the program will pay for regardless of medical necessity, "can be readily demonstrated by comparing the medical charges and billing records of self-pay patients to the charts and billing records of patients enrolled in government medical programs."  Third Am. Cmplt. ¶ 33.  The Complaint then sets out a lengthy chart that supposedly compares the "most common charges and services" provided to self-pay versus government-pay patients.  *Id*.

But again, Relator's allegations do not describe particular false claims.  The chart is merely a comparison of "common" charges, the source of which is not even identified.  Not a single patient, PPGC employee, date, or explanation for the differences is provided.

Relator would like for the Court to ***infer*** that the information on the chart in Paragraph 33 of the Third Amended Complaint gives rise to fraud on the Government.  But Rule 9(b), and even Rule 8(a), do not allow that.  ***The chart also gives rise to an inference that self-pay patients forego recommended healthcare services,*** a self-evident phenomenon acknowledged by the Institute of Medicine of the National Academy of Sciences.[14]  Paragraphs 32 and 33 at best

---

[14] The Institute of Medicine ("IOM") conducts studies that are specifically mandated by Congress or requested by

allege "facts that are 'merely consistent with' a defendant's liability," and that thus "stop short of the line between possibility and plausibility of 'entitlement to relief.'"[15]  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

**L.      Relator's "Super Bill" Allegations Do Not Support an FCA or TMFPA Claim.**

Relator alleges, in Paragraphs 34 and 35, that PPGC employed a procedure whereby "super bills" were completed before patients were seen, and that the government was charged for the services marked on the bill whether or not the service was rendered.  Third Am. Cmplt. ¶¶ 34–35.  Despite the length of the description of this alleged process in the Third Amended Complaint, the allegations fail to describe any specifics.  Nowhere does the Third Amended Complaint cite a specific example of this "super bill" procedure actually occurring.  Nowhere does it say *who*, in particular, followed the procedure (Relator does not name herself as following this or any other fraudulent procedures), *when* that occurred, or *where* it took place. *See, e.g.*, *Bennett*, 2011 WL 1231577, at *17.

What is more troubling about Relator's "super bill" claim, however, is that it does not state facts sufficient to indicate that the allegedly fraudulent claims were submitted to the government.   Relator conclusorily states that "PPGC presented these false claims for reimbursement for the services described herein to the U.S. and Texas Governments as described above."  Third Am. Cmplt. ¶ 36.  The only *fact* described in the Third Amended Complaint to support this *conclusion*, however, is the mention that a woman named Melanie Wood would

---

federal agencies or independent organizations.  The IOM has published six reports on the consequences of uninsurance, including "Coverage Matters - Insurance and Health Care" at http://www.iom.edu/Reports/2001/Coverage-Matters-Insurance-and-Health-Care.aspx.  The IOM has concluded that individuals without health insurance go without needed care, including fewer preventive services.

[15] Further, until fiscal year 2010, DSHS restricted Title XX family planning clinics to use of only three CPT codes for patient visits, and permitted use of supplemental codes for medical counseling and education.  *See* "DSHS Family Planning Procedure Codes For Title V and XX Contractors," at Exhibits 5, 6, & 7.  There is no restriction on using a different, all-inclusive charge structure for other classes of patients, such as self-pay patients.

communicate at the end of each week the reasons for any changes made to the bills submitted to the Government.[16] *Id.* ¶ 34(i).

On its face, this cannot be enough.  What Relator has described is a process by which claims were submitted to the Government in a form ***different*** from that charged on the "super bill."  Without having compared the bills to the claims submitted to the Government, Relator alleges no factual support whatsoever for the idea that the allegedly fraudulent charges made their way to the Government.  She merely jumps to this conclusion.  When there is an obvious alternative explanation at hand, fraud "is not a plausible conclusion." *Iqbal*, 129 S. Ct. at 1951–52.

## CONCLUSION

The Third Amended Complaint (1) fails to state a plausible claims for relief because, without more specifics, much of the conduct alleged actually *complies* with applicable regulations and government guidance; (2) fails to describe Relator's FCA and TMFPA claims with sufficient particularity; and (3) fails as a matter of law for several of Relator's claims.

For these and the other reasons set forth above, PPGC respectfully requests that the Court dismiss all claims in the Third Amended Complaint with prejudice, and requests any further relief the Court deems just and proper.

---

[16] Relator also alleges that the "majority of the fraudulent billing codes entered . . . to PPGC's corporate billing system were indeed submitted to the government for payment" based on the alleged rarity of communications from Ms. Wood.  Third Am. Cmplt. ¶ 34(i).  This allegation is speculative and conclusory, however, and is not a fact giving rise to plausible liability.

Dated:  November 17, 2011

Respectfully submitted,

/s/ James W. Boswell
KING & SPALDING LLP
James W. Boswell
Georgia Bar No. 069838
1180 Peachtree Street N.E.
Atlanta, GA  30309-3521
Telephone:  404-572-4600
Facsimile:  404-572-5100
jboswell@kslaw.com

David L. Schwan
Texas Bar No. 24056284
1100 Louisiana, Suite 4000
Houston, TX 77002
Telephone: 713-751-3200
Facsimile:  713-751-3290
dschwan@kslaw.com

THE HEARTFIELD LAW FIRM
J. Thad Heartfield
Texas Bar No. 09346800
M. Dru Montgomery
Texas Bar No. 24010800
2195 Dowlen Road
Beaumont, Texas  77706
Telephone:  409-866-3318
Facsimile:  409-866-5789
thad@jth-law.com
dru@jth-law.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that, on this the 17th day of November, 2011, I served a true and correct copy of the above Defendant's Motion to Dismiss Relator's Third Amended Complaint and Brief in Support to counsel of record via e-mail and the Court's CM/ECF system:

Mr. Mike Love
Mr. Steven Lamont Lovett
MIKE LOVE & ASSOCIATES, L.L.C.
P.O. Box 527
Lufkin, TX 75902–0527
mikelove@texaslawoffice.com
slovett@carrillolaw.org
*Attorneys for Relator*

Mr. Larry L. Crain
Ms. Carly F. Gammill
AMERICAN CENTER FOR LAW &
JUSTICE
5214 Maryland Way, Suite 402
Brentwood, TN 37027
lcrain@brentwoodlaw.com
cgammill@aclj-dc.org
*Attorneys for Relator*

Mr. Jay A. Sekulow
Mr. Stuart Roth
AMERICAN CENTER FOR LAW &
JUSTICE
201 Maryland Ave. NE
Washington, DC 20002
202-546-9309 (fax)
sekulow@aclj.org
sjr@aclj-dc.org
*Attorneys for Relator*

Mr. Edward L. White III
AMERICAN CENTER FOR LAW &
JUSTICE
5068 Plymouth Road

Ann Arbor, MI 48105
734-302-1758 (fax)
elwhite3@yahoo.com
*Attorney for Relator*

Mr. Francis J. Manion
Mr. Geoffrey R. Surtees
AMERICAN CENTER FOR LAW &
JUSTICE
P.O. Box 60
New Hope, KY 40052
fmanion@aol.com
grsurtees@gmail.com
*Attorneys for Relator*

Mr. Mark Coffee
Assistant Attorney General
Civil Medicaid Fraud Division
Office of the Atty. General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Mark.Coffee@oag.state.tx.us
*Attorney for the State of Texas*

Mr. Kevin McClendon
Assistant United States Attorney
United States Attorney's Office
101 E. Park Blvd., Suite 500
Plano, Texas  75074
kevin.mcclendon@usdoj.gov
*Attorney for the United States*

      /s/ David L. Schwan
      David L. Schwan